UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

CHRISTOPHER PARISH, et. al.,          :
                                      :
            Plaintiffs                :
                                      :
     versus                           :
                                      :        Case No. __3:07-cv-0452_____
CITY OF ELKHART, et. al.,             :
                                      :
            Defendants                :        **PLAINTIFFS' RESPONSE TO**
                                      :        **DEFENDANTS' MOTION FOR**
                                      :        **SUMMARY JUDGMENT**

: : : : : : : : : : : : : : : : : : : : : : : :

**BRIEF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

I.   INTRODUCTION.

In the wake of an October 1996 shooting in Elkhart, Indiana, two innocent young men,

plaintiff Christopher Parish and his then co-defendant, were falsely charged with attempted murder,

wrongfully convicted, and served long years of wrongful imprisonment.  Viewing the voluminous

evidence amassed in the Statement of Genuine Issues Appendix (hereafter "App.") that

accompanies this Brief in the light most favorable to the plaintiffs, as is required on summary

judgment, there is no question but that a reasonable jury could find that these wrongful convictions

could not have occurred but for the pervasive misconduct of several Elkhart Police Department

officers.

More significant, the officers hid their misconduct from the prosecutor in the case, making it

impossible for him to comply with his obligations under *Brady v. Maryland*, 373 U.S. 83 (1963),

and its progeny.  In particular, the defendant officers conducted unfairly suggestive and

manipulative photo identification procedures to deliver to the prosecutor prepackaged in-court

"identification" testimony that has since been disavowed by every single one of the eyewitnesses, including the shooting victim (App. ¶¶ 14-37). Moreover, each one of these witnesses—none of whom has any connection to Parish or any motive to help him—has subsequently charged under oath that defendant Rezutko misrepresented their underlying interactions with him, and concealed much exculpatory evidence bearing on Parish's innocence. (*Id.*)

As a result of these violations of his right to due process and a fair trial, Christopher Parish has suffered (along with his family) through eight years of wrongful imprisonment and protracted litigation to achieve exoneration and to clear his name. Arrested at age 19 for a crime he had nothing to do with, Parish did not win his freedom until he turned 27. Parish has since been reunited with his family and begun to rebuild his life, but the damage they all suffered has been profound. (App. ¶ 1.) This lawsuit constitutes their opportunity for justice.[1]

II.     Summary Judgment Standard

As the non-moving parties on this Motion for Summary Judgment, the plaintiffs have demonstrated through proper Rule 56 materials much more than "some metaphysical doubt as to the material facts" in this case, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). They have presented to this Court abundant evidence that would be far more than sufficient to support a jury verdict in their favor; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249. Indeed, when it is remembered that the non-movant is entitled not only to the benefit of the doubt with respect to genuine disputes of material fact, but also with respect to the reasonable inferences that may be drawn from the record, *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994), summary judgment in favor of the defendants is precluded, and their motion must be denied.

---

[1]     The other original defendant, Keith Cooper, was subsequently exonerated based upon DNA evidence. Rather than file a lawsuit such as this one, Cooper, whose faith in the judicial system had obviously been diminished, elected to accept an offer of time served in lieu of a retrial, so that he could return to his wife and family. It has been represented to Parish's counsel that all of the "victims" who originally testified against Cooper are now enthusiastically supported his petition to the Governor of Indiana for pardon.

III.   POLICE OFFICER LIABILITY FOR CONSTITUTIONAL VIOLATIONS THAT ARE HIDDEN FROM THE PROSECUTOR.

The consequences of a wrongful conviction are devastating.  An innocent man loses years of his life, locked in a crowded cage with the some of the worst that humanity has to offer.  Society loses too, because not only is an innocent man unfairly punished, but a guilty party escapes justice.

When a wrongful conviction is the result of trial-related violations of constitutional rights, however, the Supreme Court has held that the prosecutor is absolutely immune from liability under 28 U.S.C. §1983, *Imbler v. Pachtman*, 424 U.S. 409 (1976), a holding reaffirmed a few months ago in *Van de Kamp v. Goldstein*, __ U.S. __, 129 S. Ct. 855 (2009).  But as the Seventh Circuit Court of Appeals has long held, the rule is different for police officers:

> If officers are not candid with prosecutors, then the prosecutors' decisions—although vital to the causal chain in the but-for sense—are not the important locus of action.  Pressure must be brought to bear elsewhere.  Prosecutors *kept in the dark by the police*. . . won't improve their performance with or without legal liability for their conduct.  *Requiring culpable officers to pay damages to the victims of their action, however, holds out promise of both deterring and remediating violations of the Constitution*. . . Newsome has made a [] serious claim that the defendants *withheld information important to that prosecutorial (and judicial decision)*, and on this interlocutory appeal we cannot resolve disputes about the record.

*Newsome v. McCabe*, 256 F.3d 747, 752-53 (7th Cir. 2001) (emphasis added).

In a follow-on decision in the same case that is most pertinent to the instant case, the Seventh Circuit further recognized that §1983 liability can be established where a police officer has withheld material details surrounding a witness' identification of a suspect.  *Newsome v. McCabe (Newsome II)*, 319 F.3d 301 (7th Cir.2003).  Thus, under *Newsome II*, police violate due process not so much by the act of prodding, coaching, manipulating or even threatening a witness, but rather for the subsequent withholding of the critical details about how it was that they managed to induce the witness falsely to implicate their preferred suspect.  As the Court said: "liability is under the due

3

process clause because [the defendant police officers] concealed exculpatory evidence—*the details about how they induced the witnesses to finger Newsome*. . . Newsome's lawyers needed, but did not receive, information vital to probe whether manipulation occurred," *id.* at 302-05 (emphasis added).

IV.   *BRADY* AND THE DUE PROCESS RIGHT TO A FAIR TRIAL.

Among the many rights guaranteed by the due process clause of the 14th Amendment is the right of a criminal defendant to a fair trial.  As the Supreme Court made plain in *Brady v. Maryland*, 373 U.S. 83 (1963), a criminal trial is *not* "fair," and due process therefore *cannot* be served, when material evidence favorable to an accused has been suppressed:

> Society wins not only when the guilty are convicted but when criminal trials are fair; our
> system of the administration of justice suffers when any accused is treated unfairly.

373 U.S. at 87.  Reiterating the link between due process and fair trial, the Seventh Circuit noted in *Newsome* that it is a "due process claim in the original sense of that phrase—[the accused]  did not receive a fair trial [where state actors] withheld material exculpatory details;" 256 F.3d at 749-53.

Often, the remedy for a *Brady* violation is a reversal of the resulting conviction, but the Seventh Circuit has recognized, as described in Part II supra, that § 1983 liability may attach where a police officer's actions in withholding material exculpatory information results in a denial of this right to a fair trial.

To qualify as an actionable *Brady* violation, the exculpatory evidence that was withheld must be "material" in the sense that it "might have affected the outcome of the trial;" *United States v. Agurs*, 427 U.S. 97, 104 (1976).  However, as the defendants have correctly noted, Deft. Br. at 5, the determination of "materiality" requires a more functional approach.  In *Kyles v. Whitley*, 514 U.S. 419, for example, the Court stated that

> The question is not whether the defendant would more likely than not have received a
> different verdict with the [suppressed] evidence, but whether in its absence he received a *fair*

trial, understood as a trial resulting in *a verdict worthy of confidence*. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "*undermines confidence* in the outcome of the trial."

514 U.S. at 434, quoting in part *United States v. Bagley* 473 U.S. 667 (1985).

At the same time, *Kyles* teaches that when assessing our confidence level in the outcome, the withheld evidence must be considered in the aggregate, not each piece in isolation. The Court said:

> One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case *in such a different light* as to *undermine confidence in the verdict*.

514 U.S. at 435.

This in turn has led to the sensible understanding that the weaker the evidence generally, the more likely it is that any particular piece of suppressed evidence would have been a "game changer." See *Dennis v. Mitchell*, 68 F.Supp.2d 863, 900 (N.D. Ohio 1999) ("[T]he court must view the undisclosed evidence in relation to the record as a whole, as the materiality of exculpatory evidence will vary with the overall strength of the government's case.").

In the instant case, even the chief investigating officer (Rezutko) admitted that he had exactly *zero* evidence connecting Parish to the crime, absent the witness identification testimony (App. ¶ 12.). Furthermore, he never even considered any other leads or suspects (App. ¶¶ 18 and 39-40, and accompanying notes). Thus, even a small amount of withheld information would suffice to call "confidence in the outcome" into doubt. And of course, as shown throughout the Appendix, there is not merely a small amount of withheld evidence to match against Detective Rezutko's zero evidence—there is an avalanche. This evidence is set forth in Plaintiff's accompanying Appendix, but is summarized as follows.

a.     *Eddie Love's Initial Supply of the Parish Name.*

As described in App. ¶¶ 14-18 and accompanying notes, Eddie Love was the essential first link to Parish, because without his disputed "looks like a guy I know" comment, Rezutko could just as easily have placed one of thousands of other individuals in a photo array.  Love, however, denies that he made the remark at all, denies that it had the meaning Rezutko chose to impress upon it, and testified under oath that he *told* Rezutko that Chris Parish—whom he knew by name and sight—was *not* one of the perpetrators.  Love also testified under oath that he only agreed to go along with Rezutko's preferred story out of fear of retaliation by Rezukto (App. ¶ 16.)

Rezutko, not surprisingly, testified to facts that are almost 180 degrees in the opposite direction—but that merely confirms the existence of a major dispute over a major issue of material fact.  See *Rodriguez v. Woodall*, 2004 WL 2583883, *3 (N.D. Ill. 2004) (§1983 due process fair trial claim was stated against a police officer for "intentionally influencing and coercing Bolton to falsely identify Rodriguez as Zayed's murderer and failing to disclose this coercion to prosecutors or Rodriguez's defense counsel").

b.     *Eddie Love's Tape-Recorded Statement Under Duress.*

App. ¶ 17, note 11 describes a 16 year-old Eddie Love being threatened (with a gun placed ostentatiously on the table) in order to "convince" him to testify in accord with the wishes of the police investigators.  While Defendants might dispute Love's claim, it obviously may not be dismissed on summary judgment, and the resulting dispute of material facts is material.

c.     *Nona Canell's Supposedly Certain Identification of Parish..*

Nona Canell's encounters with Detective Rezutko (App. ¶¶ 19-26) with respect to her supposed "identification" of Parish provide a trove of both disputed issues of material fact and examples of hiding and fudging of evidence by an investigator.  Moreover, the recantation of her

testimony and her recriminations against Rezutko's false reports of what she had earlier said could not be more decisive. From the bizarre use of a juvenile's photograph to seek identification of a young adult, to the even more bizarre disappearance of that photograph to this day, Canell's current testimony cannot be blinked away or minimized. And it must not be forgotten that a closely divided and almost hung jury sought additional information about only a small number of issues—the missing juvenile photo being one of them. (App. ¶ 23.)

The defendants in this case make much of the fact that Parish's criminal defense counsel had ample opportunity to cross-examine Canell (and the other witnesses); Deft. Statement, *passim*. But that misses the point. How much "confidence" can anyone have even in that great "engine of truth," if the most potent source of cross-examination has been tainted, suppressed, or lost? *United States v. Bagley*, 473 U.S. 667 (1985) (*Brady* obligation encompasses evidence that bears on the credibility of the testimony of State witnesses).

A jury might find that there was some innocent explanation for the disappearance of the crucial photograph, but it might also draw the contrary inference. That uncertainty alone, where ties go to the non-movant, precludes summary judgment for the defendants.

> d.    *Michael Kershner's Supposed Identification of Parish.*

With respect to the shooting victim's supposed photo identification of Parish, initially from his hospital bed, there is again a huge contrast between Michael Kershner's testimony as the prosecutor and defense counsel knew it at the time of the criminal case and as it has now been revealed to be. See App. ¶¶ 27-37. But in Kershner's case, as opposed to his mother's, there are *two* critical items that have mysteriously disappeared, not just one. First, there is the initial report detailing Kershner's contemporaneous statements—which even Rezutko states absolutely should have been in the police department's case file, as does plaintiff's expert witness Andrew Scott, of

7

course (App. ¶¶ 29-31). Second, there is missing not just a single photograph, but an entire photo array that Kershner claims to have signed, but Rezutko—again conceding that it should have been in the case file—did not provide to the prosecution or the defense. (App. ¶¶ 32-35.)

Our civil jury could certainly conclude that a criminal trial at which any one of those pieces of evidence was withheld is one in which one should lack "confidence" in *Kyles* terms. In *Dominguez v. Hendley*, 545 F.3d 585, 590-91 (7th Cir. 2008), for example, the jury was permitted to find that the defendant police officer had "withheld" an exculpatory rape kit, thus violating *Brady*, although he staunchly denied withholding it, because he claimed that he had never even seen it. The jury did not believe him, and liability under §1983 was upheld by the Seventh Circuit.

     e.     *Rezutko's Undisclosed Relationship with a Possible Witness or Suspect.*

Elkhart is not a large city, but it still seems more than a little odd that the chief investigator of a shooting incident had a personal relationship with a known drug dealer who happens to live across the hall from the apartment—bristling with weapons—where the shooting is alleged to have taken place. (App. ¶¶ 38-40). To add to the drama, the drug dealer's apartment was itself the scene of a violent home invasion several weeks earlier.

The significance of Rezutko's relationship with Sheila (whose nickname of "Shell" *also* figured in the Kerhsner shooting), App. ¶ 38, is obvious, if the jury chose to accept it as true. Rezutko did not document or disclose to anyone this "back story" behind his investigation, yet it would have provided fruitful avenues for impeachment on cross-examination.  ?  The inference that Rezutko's refusal to consider any suspects other than Parish (and Cooper), see App. ¶ 40, was a way of shielding Shell's involvement would not be an unreasonable one for a jury to draw. *Strickler v. Greene*, 527 U.S. 263 (1999) (withholding important *impeachment* evidence is just as much a violation of the due process right to a fair trial as is hiding physical exculpatory evidence).

8

   *f.*    *Brady Violations in Connection with the Purported Identification of Keith Cooper Infected the Parish Trial, and Denied Parish a Fair Trial.*

As described in App. ¶¶ 41-50, the rogue methods that Detective Rezutko used to procure bogus identifications of Keith Cooper are beyond disturbing.  As Rezutko himself admitted, App. ¶ 44, he arranged a photo array in which the "filler" pictures were *dissimilar* to the picture of his suspect—leaving Cooper as the only suspect in the lineup who matched the victim's description. And if the testimony of eyewitnesses is credited, as it must be on summary judgment, Rezutko turned a deaf ear to their requests for a confirmatory in-person lineup, on the grounds that they would recognize Cooper when they saw him at the defense table at trial.  (App. ¶¶ 47, 49).  And as a capstone, Rezutko even tried to assuage Michael Kershner's doubts about his identification by assuring him that the police knew that they had the right man in custody.  (App. ¶ 49.)

Of course, Cooper is not a plaintiff in this case, see n. 1 supra, but the impact of these gross violations of the *Brady* principle on the fairness of Parish's trial is clear.  By the time of trial, the eyewitnesses were claiming that they had been able to identify *both* assailants with ease.  Rezutko had presented the prosecutor with a tidy but bogus package deal.  But it should be obvious that if defense counsel had been told only about what Rezutko had failed to reveal about the weakness of the evidence against Cooper, and nothing about Parish, Parish's defense would still have been immeasurably enhanced.  *Falsus in uno; falsus in omnibus.*

V.   THE PERVASIVE USE OF UNDULY SUGGESTIVE AND UNFAIR IDENTIFICATION PROCEDURES FURTHER DEPRIVED CHRIS PARISH OF THE DUE PROCESS RIGHT TO A FAIR TRIAL.

In this Circuit, as elsewhere, a police officer can be held liable under §1983 for employing unduly suggestive identification procedures resulting in a faulty eyewitness identification which, when introduced at trial, deprives a criminal defendant of the fair trial that is at the heart of the right not to be deprived of one's liberty without due process of law.  *Alexander v. City of South Bend,*

433 F.3d 550 (7th Cir. 2006) (right recognized but proof failed); *Hensley v. Carey*, 818 F.2d 646, (7th Cir. 1987) (right recognized but no trial held).

As the defendants have correctly pointed out, Def. Br. at 7, *Alexander* does not establish a constitutional right to have police lineups, photo arrays, and witness interviews "meet a particular standard of quality;" 433 F.3d at 555. But the Court went on to say, immediately thereafter, that the Constitution "does, however, guarantee the right to a fair trial—in this context, via the due process clause of the Fourteenth Amendment—and that right is violated if unduly suggestive identification techniques are allowed to taint the trial." *Id.* at 555. In order to rise to the level of a constitutional violation that may be addressed under §1983, in other words, the flaws in police identification techniques must be shown by the plaintiff to have "made his trial unfair," and that "unduly suggestive identification procedures led to an unreliable identification that undermined the fairness of his trial;" *id.* 555-56.

The standard for showing unreliability and unfairness, borrowing from *Manson v. Brathwaite*, 432 U.S. 98 (1977), is a case-specific and fact-intensive inquiry—one that is usually not well suited for decision on summary judgment. Summary judgment against the plaintiff *was* upheld in *Alexander v. South Bend*, however, but only because the plaintiff did not deign to supply the kind of information demanded by *Brathwaite*; he did not show, moreover, *how* the flawed procedures *actually* deprived him of a fair trial. On summary judgment, Alexander's lawyers submitted essentially no evidence about what evidence had been produced at the underlying trial, what exhibits and other evidence had been gathered under what specific circumstances; 433 F.3d at 555.

In the instant case, by contrast, the plaintiffs have set forth a potpourri of suggestiveness, unreliability, and unfairness. Nona Canell is shown a picture of a pre-teen boy, but now the photograph is missing (App. ¶¶ 21-22). Michael Kershner gives a statement about the shooting and his

supposed identification of Parish, but it is not kept as evidence (App. ¶¶ 29-31). Kershner actually signs a photo array to indicate his identification of a suspect, but this too has disappeared (App. ¶ 32). And the photo array used to identify Keith Cooper (which is later used to enhance the credibility of the witnesses against Parish) includes a bald man and a man with a mustache (App. ¶ 41).

To this evidence must be added the testimony of expert witness Andrew Scott, the former Chief of Police of Boca Raton [Exhibit 9; Scott Dep. at 94-95; Exhibit 50; Scott Aff. Opinion #1, ¶ 5]. The point of Scott's testimony is that such practices are not merely bad law enforcement, but tend to result in suggestive and unfair in-court identifications. Moreover, according to Larry Towns, Rezutko's former partner and boss, this was standard operating procedure for Rezutko: "he often put together extremely suggestive line-ups in order to push the witness towards his preferred suspect instead of letting the witness make an independent decision." [Exhibit 48; Towns Aff. ¶ 8.]

VI.   SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS AMBROSE AND CUTLER IS PRECLUDED BY THEIR PARTICIPATORY AND SUPERVISORY ROLES IN THIS CASE.

As set out in App. ¶ 59, defendant Steve Ambrose played some role—whether it was large or small would be for a jury to decide—in Steve Rezutko's scheme to procure bogus witness identifications against Chris Parish and close the Kershner shooting case. He was allegedly also the other detective who participated in the tainted Debrey Coleman interactions. These factual disputes are sufficient to preclude summary judgment in his favor.

Defendant Tom Cutler served as Rezutko's supervisor during the period of the Kershner shooting, and claims to have played only a "rubber-stamping" role; App. ¶ 60. Even if a jury were to believe that that was the extent of his involvement, that role can give rise to § 1983 liability under some circumstances. See *Rascon v. Hardiman*, 803 F.2d 269, 274 (7th Cir. 1986) ("supervisory liability" attaches where supervisor has demonstrated continued inaction or indifference in the face

11

of repeated abuse); *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996) (same); *Shaw v. Stroud*, 13 F.3d 791, 799-800 (4th Cir. 1994) (same).

Indeed, the burden of police practices expert Andrew Scott's testimony is essentially that Cutler served as *too much* of a rubber stamp, opining that Cutler failed to address the patent inconsistencies in Rezutko's investigation before signing off on it for transmittal to the prosecutor. [Exhibit 9; Scott Dep. at 97, 109-111; Exhibit 50; Scott Aff., Opinion # 3.] Scott's opinion that the failure to oversee Rezutko's work was "deplorable" may or may not be adopted by the jury, but it is sufficient to preclude entry of summary judgment.

VII.   QUALIFIED IMMUNITY IS INAPPLICABLE

Defendants make a half-hearted qualified immunity argument consisting of three conclusory sentences, but this is obviously a nonstarter. If Plaintiffs' evidence is credited, this is not a qualified immunity case. Each of the alleged constitutional violations was clearly established.

As for the Brady-based due process claim, Defendants do not -- and cannot -- really dispute that Section 1983 liability for withholding exculpatory evidence was well-established. Newsome v. McCabe, 260 F.3d 824 (7th Cir. 2001) (recognizing that a police officer's duty to disclose Brady material was clearly established not later than 1988 when the Seventh Circuit decided Jones v. City of Chicago, 856 F.2d 985 (7th Cir. 1988)"). Defendants do not so much take issue with the well-established nature of the rights; instead, they deny that they did what is alleged. Qualified immunity thus turns on disputed facts, and is unavailable. See Saucier v. Katz, 533 U.S. 194, 201 (2001).

Similar analysis governs the allegation that Rezutko used unduly suggestive identification procedures. Dating back at least to Manson v. Brathwaite in the 1970s, the law has been clearly established that it is unconstitutional to utilize unduly suggestive identification procedures. See Rojas v. Iannatto, 2003 WL 169798, *4 (S.D.N.Y. Jan. 24, 2003) ("a criminal defendant's right not

12

to be subjected to unduly suggestive identifications has been the law since 1977") (citing

Brathwaite).  Courts have thus rejected qualified immunity on this basis.  Gregory v. City of

Louisville, 444 F.3d 725, 746-47 (6th Cir. 2006) ("the district court correctly denied Tarter qualified

immunity for Plaintiff's claim of suggestive identification"); Geter v. Fortenberry, 882 F.2d 167,

170 (5th Cir. 1989) (no qualified immunity for police officer's "suggestive" methods of obtaining

improper eyewitness identifications).

 In short, this is not a qualified immunity case.  If the jury credits Plaintiffs' evidence, then no

such defense could apply.

VIII. THERE IS SUFFICIENT EVIDENCE IN THE RECORD OF THE CITY OF ELKHART'S
  UNCONSTITUTIONAL POLICIES AND PRACTICES TO PRECLUDE ENTRY OF SUMMARY
  JUDGMENT IN ITS FAVOR ON THE PLAINTIFFS' *MONELL* CLAIMS.

 It is well-settled that a municipality cannot be held liable for constitutional violations under

a theory of *respondeat superior*, but equally well established that § 1983 liability may attach where

a constitutional violation results from a municipal policy or practice.  *Monell v. Department of Soc.*

*Serv.*, 436 U.S. 658, 694 (1978).  An express policy, while obviously sufficient to establish such

liability, is not necessary.  Rather, "a widespread practice that although not authorized by written

law or express municipal policy is so permanent and well settled as to constitute a custom or usage

with the force of law" can also suffice.  *Looper Maint. Serv. Inc. v. Indianapolis*, 197 F.3d 908, 912

(7th Cir. 1999).

 With respect to the police practices that led to the wrongful conviction and incarceration of

Chris Parish, the plaintiffs pursue *Monell* claims arising out of the City of Elkhart's "street files"

practice within its Police Department, as well as for failure to train and deliberate indifference on

the part of the City's designated policymaker in this area.

*a.     The City of Elkhart's Long-Established "Street Files" Practice is a Custom or Usage that Precludes Summary Judgment in its Favor.*

In *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988), the Seventh Circuit affirmed a jury verdict on a *Monell* claim, where the plaintiff's wrongful conviction was caused, at least in part, by a municipal policy and practice approving of personal files that were kept by the police department's detectives; 856 F.2d at 995.  Specifically, the Jones plaintiff showed that the detectives in his case not only withheld much of the information obtained during the investigation—an obvious *Brady* violation—but that they did so systematically, pursuant to the City of Chicago's then-existing "street files" practice.

Street files are personal files kept by the detectives containing notes and other information relating to an investigation. When a detective closes a case, he transfers to the official file (via police reports) all of the information from his street file that implicates his suspect, but then destroys all of the information that potentially pointed in a different direction.  *Id.* at 990-92. According to the Seventh Circuit, the policy and practice (or custom and usage) that led to such massive *Brady* violations was sufficient to establish liability under *Monell*; 856 F.2d at 995; *see also Fields v. City of Chicago*, 931 F.2d 58 (7th Cir. 1991) ("Were Mr. Fields to prevail [in showing that information from the street files had been withheld], he would also have had evidence of the elements necessary to show that his trial was unconstitutional under *Brady* and *Bagley*."  Indeed, it might be said that maintaining street files is not merely a *Brady* violation waiting to happen, but both a recipe and a how-to manual as well").

In *Palmer v. City of Chicago*, 562 F. Supp. 1067 (N.D. Ill. 1983), federal judge Milton Shadur made detailed findings about the City of Chicago's street files practice, and trenchantly set out its evils.  In sum, the Palmer decision, which is attached hereto for the Court's convenience as Exhibit A as permitted by L.R. 7.1(e), explained that a departmental practice of permitting

14

detectives to keep personal files relating to ongoing investigations gives rise to municipal liability where the policy and practice permits detectives to sanitize their files before creation of their official police reports, only transferring information that points at the suspect from their notes into the official reports. Based on the record in this case, the policy and practice described in *Palmer* and *Jones* is indistinguishable from the practice in Elkhart at the time of Parish's conviction.[2]

Specifically, according to Rezutko, he took notes during the Kershner shooting investigation and kept them in his personal file. [Exhibit 15; Rezutko Dep. at 85.] When he was finished with the case, he formalized some of the information in his police reports for the prosecutors and threw away his file. [*Id.*] Critically, when Rezutko threw away his file, all of the notes on subjects that "did not pan out" were simply tossed; they were not provided to the prosecutor. [*Id.* at 86.] Information that could have exonerated Rezutko's suspect was *not* preserved because, in Rezutko's words, he "wasn't big on reporting a lot of negative information." [*Id.* at 188.]

For *Monell* purposes, what Rezutko described was consistent with the policies and practices of the Elkhart Police Department, which had no rule prohibiting the practice. [*Id.* at 85-86.] Even more tellingly, in response to a Rule 36 Request for Admissions, Elkhart admitted that during the time period at issue, it did not have any policy or practice requiring its police officers to retain their notes from witness interviews. [Exhibit 32; Elkhart's Resp. 1st Req. to Admit, ¶¶ 21-22.]

As a result, there are virtually no notes in the City's official file in this case. [Exhibit 27; Official File; Exhibit 28; Elkhart's Resp. to First Req. for Prod., ¶¶ 28 & 45 (notes); Exhibit 43; Defs. Resp. Third Req. for Prod., ¶ 2 (same).] Moreover, there is ample evidence in the summary judgment record that Rezutko's "street file" practice resulted in the non-production of a wide

---

[2]   *Palmer* was a class action involving injunctive relief, and some aspects of the Orders entered by Judge Shadur were later reversed by the Seventh Circuit on standing and related grounds; *Palmer v. City of Chicago*, 755 F.2d 560 (7th Cir. 1985.) The Seventh Circuit did not question the trial court's factual findings or his criticism of the street files practice.

variety of potentially exculpatory information, some of which has already been discussed, and some of which is contained in Plaintiff's Appendix.

For example, virtually all of the eyewitnesses in the case have testified that they provided Rezutko with exculpatory information that never made the transition from Rezutko's notes to the official file. (App. *passim*.)  There is also no documentation in the official file regarding the Eddie Love photo spread identification itself; instead, there is only Love's statement. [Exhibit 15; Rezutko Dep. at 136-37.]  And Rezutko cannot explain its absence.  [*Id.* at 138 (Rezutko: "Why it's not in here, I have no idea.  Remember reading that one. . .").]  There also should exist a contemporaneous arrest report for Parish when he was arrested for attempted murder.  [*Id.* at 193-96.]  This report would recap the evidence in the case and would have memorialized the exact date of the arrest, and the substance of Rezutko's interview with Parish.  [*Id.* at 196.]  Inexplicably, however, even Parish's arrest report is missing from the official file.  [*Id.* at 197.]  Rezutko also admits that while he would take notes, he did not create any official documentation if witnesses were unable to make identifications during photo lineups.  Exhibit 15, Rezutko Dep. at 49-50.  That was consistent with the policies, practices, and training of the Elkhart Police Department, which had no rule requiring documentation when witnesses failed to make identifications.  [*Id.* at 50, 139-40.]  But it is of course diametrically opposed to accepted police practices.  [Exhibit 50; Scott Aff. Opinion 1, ¶ 11.]

These are merely more examples.  When coupled with the evidence discussed throughout earlier portions of this Brief, a jury could readily find that there exists in the Elkhart Police Department a parallel system of "off-the-books" files containing detective notes and other important information that never sees the light of day (unless it supports the State's case).  Elkhart permitted such practices, condoned them, and may even have encouraged them as a matter of

custom and usage.  Under *Jones* and *Palmer*, that would give rise to *Monell* liability, should the jury choose to so find.

Of course, to establish liability under *Monell*, "there must be an affirmative link between the policy and the particular constitutional violation alleged," *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985).  But that link is obvious in this case; the *Brady* violations that led to Parish's unjust conviction *all* had their genesis in the City of Elkhart "street files" practice.  *Brady* material that would have quickly sunk the State's case, instead languished in Rezutko's personal file, and then in the trash bin.

     b.     *The City of Elkhart is Also Liable under Monell for the Deliberate Indifference of the Relevant Policy Maker*

At his deposition, Elkhart's then-Chief of Police Dennis Bechtel testified that he was the relevant policy-maker to whom final policy-making authority had been delegated by the City for all matters relating to the handling of police investigations.  [Exhibit 44; Bechtel Dep. at 11-15, 21.] For purposes of the plaintiffs' claims against the City under *Monell*, therefore, Chief Bechtel is the relevant policy-maker, whose own actions (or inactions) can give rise to municipal liability.  *Gable v. City of Chicago*, 296 F. 3d 531,537 (7th Cir. 2002).

Municipal liability can be established where the City's policymaker—here, the Chief— displays deliberate indifference to the risk that unconstitutional conduct will occur on his watch. See *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001), a case involving retaliation against prison inmates who had earlier filed a lawsuit against prison authorities:

> Where the retaliatory acts are traceable to a custom or policy, however, it is unnecessary to demonstrate that the decision-making official directly ordered each act carried out under his edict.  [A] policy-maker's pronouncement that he has not or will not discipline officers that retaliated against prison litigators is sufficient evidence of a policy or custom: those

statements can "be[ ] considered to represent [the prison's] policy or custom of condonation of, and acquiescence in, [retaliation] by its offic[ials]." [citation omitted]

The findings of fact detail the top administrators' failure to investigate the retaliation complaints, the lack of reprimand or discipline for the officers involved even when their supervisors were aware of the complaints, and the delegation of investigation to officers involved in the grievances. This "turn a-blind-eye" approach does not insulate the Department. On the contrary, the findings are more than sufficient to support the conclusion that the retaliatory acts were condoned by the officials, sufficient to "ma[k]e clear to officers that ... they could get away with anything."

This case presents exactly the same situation.  Tragically, Parish's wrongful conviction was the direct by-product of municipal indifference to Rezutko's blatant shortcomings.  According to Rezutko's former partner and supervisor (Larry Towns ), Rezutko "often put together extremely suggestive line-ups in order to push the witness towards his preferred suspect instead of letting the witness make an independent decision." [Exhibit 48; Towns Aff. ¶ 8.]  "For example, if a suspect was described as having a mustache, Rezutko would use a photo array that included the presumed suspect with a mustache and five other individuals without mustaches." [*Id.*; Exhibit 15; Rezutko Dep. at 173-75 (admitting he did exactly that with respect to Keith Cooper).]  Compounding the problem, when Rezutko would perform photo line-ups, he would often make improper remarks, such as "How does #2 look to you?" thereby leading the witness in a suggestive manner. [Exhibit 48; Towns Aff. ¶ 10.]

The deficiencies that Rezutko had as an investigator, many of which were on full display during the Kershner investigation, were common knowledge at the Elkhart Police Department. [Exhibit 48; Towns Aff. ¶¶ 5-6.]  This included the Department's most senior leadership, including the policy maker, Chief of Police Dennis Bechtel.  [*Id.* ¶ 15.]

By 1996, Rezutko had been demoted within the Detective Bureau, meaning that he was not permitted to work on homicide cases unless there was a serious manpower shortage. [*Id.* ¶¶ 4-7, 12.] The reason Rezutko was removed from the investigation of homicide cases was due to his poor investigative work, his habit of rushing to judgment, his frequent manipulation of evidence, and his use of suggestive photo line-ups. [*Id.* ¶ 4.]

Rezutko's demotion, however, apparently did not preclude him from working on attempted homicides, such as the Kirshner shooting. Captain Towns did not have the authority to terminate Rezutko's job altogether, but he did meet with Chief Bechtel to discuss his concerns about Rezutko's investigative practices. [*Id.* ¶¶ 17-18.] Chief Bechtel admitted to Towns that he wanted to fire Rezutko, but he never actually did so. [*Id.* ¶ 18.]

The foregoing is sufficient to permit a jury to conclude that the relevant policy maker was deliberately indifferent to the risk that officers like Steve Rezutko would massively violate the *Brady* rule, in this case resulting in Chris Parish's wrongful conviction. Compare *Beck v. Pittsburgh*, 89 F.3d 966 (3rd Cir. 1996) (ineffectual oversight constituted "sufficient evidence from which a reasonable jury could have inferred that the City of Pittsburgh knew about and acquiesced in a custom tolerating the tacit use of excessive force by its police officers").

Because reasonable jurors could find that Chief Bechtel was deliberately indifferent to Detective Rezutko's propensity to violate suspects' constitutional rights—thus acquiescing in the Elkhart Police Department custom, summary judgment must be denied.

> *d.     The Elkhart Police Department Failed to Provide Proper Training Regarding Photo Identification and Other Investigative Procedures.*

Municipalities are also accountable where a failure to train amounts to deliberate indifference. *Gable v. City of Chicago*, 296 F.3d 531, 538 n.3 (7th Cir. 2002) (*Monell* claim

established either by showing that the municipal "customs are themselves unconstitutional" or by showing that a failure to train was deliberately indifferent).

Elkhart permitted Rezutko to lead the Kershner investigation even though he had no prior experience with shootings. [Exhibit 15; Rezutko Dep. at 10-11.] There was no specialized investigative training for Rezutko when he joined the detective bureau, nor had he attended any police academy. [Id. at 9; Exhibit 9; Scott Dep. at 141.] Rezutko simply learned on the job. [Exhibit 15; Rezutko Dep. at 10.] Informal on the job training is insufficient, and is not a proper substitute for genuine training for attempted homicide investigations. [Exhibit 9; Scott Dep. at 110-11 (Rezutko has not been provided "the skill set" to perform these investigations).] Moreover, plaintiff's expert has further opined that Rezutko's training to conduct shooting investigations was totally insufficient, including a total lack of crime scene expertise. [Exhibit 9; Scott Dep. at 121.] The totality of these deficiencies could be determined by a finder of fact to amount to deliberate indifference, which would again preclude summary judgment.

Rezutko's training was similarly deficient when it came to eyewitness identifications. Specifically, Rezutko never received any training from any Elkhart detectives on how to do lineup identifications, and never attended any police academy where such training was provided. [Exhibit 15; Rezutko Dep. 65.] According to Rezutko, "the police department never communicated through verbal instruction or written instructions how to put a photo lineup together" or how to document one. [Id. at 66.] Detective Steve Ambrose confirmed the lack of any meaningful training in this regard. [Exhibit 16; Ambrose Dep. at 65.] Indeed, Elkhart itself has admitted that at all relevant times, it has had *no* policy or practice requiring its police officers to receive formal training in how to create photographic lineups. [Exhibit 32; Elkhart's Resp. to 1st Set of Req. to Admit, ¶¶ 17-18.]

As has been argued throughout this Brief, and as has been shown throughout the Statement of Genuine Issues, the loss of eight years of Chris Parish's life was chiefly caused by a series of improper and suggestive photo identification procedures, the details of which were withheld from both the prosecutor and his defense counsel. Thus, in the context of this case, a jury could reasonably conclude that Elkhart's was deliberately indifferent to its failure to train Rezutko with respect to conducting photo lineups, which was in turn deliberately indifferent to the near certainty that suspects' rights would be violated. In this case, Chris Parish *was* that suspect, and the City's deliberate indifference caused him great harm. Summary judgment is therefore precluded with respect to the failure to train claim as well.

> e.     *The Suggestive Photo Identification Procedures Employed by Detective Rezutko were Themselves Consistent with Elkhart's Policies and Practices.*

Finally, according to Rezutko, the complained-of manner in which he performed these photo identifications was itself consistent with the policies and practices of the Elkhart Police Department. [Exhibit 15; Rezutko Dep. at 64: "It was consistent with the practices of the detective bureau. I don't know if there was ever a policy and procedure in any kind of a written form or a manual."] In fact, there was no written policy regarding photo identifications, at least none of which the detectives were aware. [Exhibit 16; Ambrose Dep. at 69.] Instead of explicit written rules, Elkhart had just "very informal" practices, and the Police Department permitted each detective to chose his own methods as he saw fit. [Exhibit 15; Rezutko Dep. at 65.]

On that score, Elkhart has again made a series of relevant admissions about the extent to which Rezutko's actions in this case were consistent with Elkhart's policies and practices generally. These include: the manner in which the photographic evidence was produced to the prosecutors; [Exhibit 32; Elkhart's Resp. to First Req. to Admit, ¶ 16]; the manner in which Rezutko was trained

to create photo lineups; [*Id.* ¶ 19]; and the manner in which Rezutko was trained to conduct photo lineups [*Id.* ¶ 20.]

In sum, the overall manner in which the Kershner shooting investigation was conducted—with all of its problems and tragic consequences—was *consistent* with the policies and practices of the Elkhart Police Department. Accordingly, if a jury were to find that Rezutko's actions were in violation of constitutional norms, there is also ample evidence from which the jury could conclude that those unconstitutional actions were undertaken pursuant to Elkhart's policies and practices. Summary judgment in favor of the City of Elkhart is therefore precluded.

IX.   THE DERIVATIVE CLAIMS OF PARISH'S CHILDREN CANNOT BE DISMISSED AS A MATTER OF L LAW.

Finally, summary judgment on the claims raised by the children-Plaintiffs is also unavailable. In their motion, Defendants do not raise any additional issues other than those addressed and resolved in Plaintiffs' favor in their Fed. R. Civ. P. 59 motion and attendant memorandum of law.

As set forth in that motion, under the Due Process Clause of the Fourteenth Amendment, the children-Plaintiffs have a protected liberty interest in the companionship and society of their father, Christopher Parish. A minor child has a cognizable liberty interest even when the deprivation is not permanent, such as when a parent is wrongfully incarcerated. Ovando v. City of Los Angeles, 92 F. Supp. 2d 1011, 1019 (C.D. Cal. 2000) (holding that, in the case of a minor child whose father was wrongfully imprisoned for almost three years, "the unlawful imprisonment of Destiny's father constituted a complete deprivation of his companionship and society for the term of his imprisonment."); Elwell v. Gates, 2001 WL 1850990, *3 (C.D. Cal. Feb. 13, 2001) (same).

In this case, the Parish children allege that they "were deprived of the love, affection and companionship of their father for eight years, which caused them significant emotional strain and

22

mental anguish." Compl. ¶ 28. Those allegations are sufficient to survive a motion for summary

judgment. Smith v. Fontana, 818 F.2d 1411, 1418 (9th Cir. 1987), overruled on other grounds by

Hodgers-Durgin v. de la Vina, 199 F.3d 1037 (9th Cir. 1999).

Defendants do not dispute that, in Russ v. Watts, 414 F.3d 783, 790 (7th Cir. 2005), the

Seventh Circuit expressly left open the question of a minor child's interest in the relationship with

his or her parents. To the contrary, the only challenge the Defendants lodge at the existence of the

children-Plaintiffs' claim for consortium is that because the Defendants' actions were purportedly

not directed at Parish's relationship with his children, there is no cognizable claim. That contention

has already been raised and rejected.

As the children-Plaintiffs explained in their Rule 59 motion, the Seventh Circuit has never

required that a plaintiff prove that the state action was directed at the parent-child relationship in the

context of a minor child's due process claim for loss of association and loss of companionship.

Rather, the Seventh Circuit has held only that the Constitution does not protect "a parent's

relationship with his adult children in the context of state action which has the incidental effect of

severing that relationship." Russ, 414 F.3d at 787 (emphasis added). The Russ court made clear

that its holding was specific to the particular facts of that case: "minor children's need for the

guidance and support of their parents warrants 'sharply different constitutional treatment.'" Id. at

790 (citations omitted).

Moreover, Supreme Court caselaw does not require the Parish children to demonstrate that

Defendants' actions were specifically aimed at terminating or interfering with their relationship

with their father. In Daniels v. Williams, 474 U.S. 327 (1986), the case relied on by the Seventh

Circuit in Russ, 414 F.3d at 789, to impose this requirement in the context of a parent claiming a

liberty interest, the Supreme Court rejected the due process claim of an inmate at a city jail who

slipped and fell on a pillow negligently left on the stairs by a correctional officer. Under these circumstances–a slip-and-fall case involving mere negligence–the Court held that the Due Process Clause applies only to deliberate, not negligent, decisions of government officials that deprive a person of life, liberty, or property. Daniels, 474 U.S. at 328, 331. Here, by contrast, there is evidence, as set forth above, that the actions of Defendants were undertaken "with malice, fraud, gross negligence, or oppressiveness that was not the result of a mistake of fact or law, honest error in judgment, overzealousness, mere negligence, or other human failing." See Sections II & III, supra. Because the Parish children have demonstrated evidence of malice and wilfulness, there is no risk of "constitutionalizing all torts," or expanding Due Process protections beyond the bounds delineated by the Supreme Court.

X.    PUNITIVE DAMAGES ARE APPROPRIATE AGAINST THE INDIVIDUAL
      DEFENDANTS

As an afterthought, the Defendants argue that punitive damages are inappropriate in this matter, and they request summary judgment on the same. Plaintiffs concede that punitive damages against a municipality are unavailable and for that reason, Plaintiffs do not seek punitive damages from Elkhart. City of Newpart v. Fact Concerts, Inc., 453 U.S. 247, 271 (1981). For the individual defendants, however, Plaintiff has demonstrated sufficient facts showing that their actions were reckless and callous, and that those actions caused Plaintiff Christopher Parish to be wrongfully incarcerated for eight years. See Sections II & III, supra. As a result, summary judgment is unavailable. See Sahagian v. Dickey, 827 F.2d 90, 101 (7th Cir. 1987) (finding summary judgment inappropriate on punitive damages claim by inmates alleging prison officials denied them access to legal materials in violation of due process because genuine issues of material fact remained); Fitzpatrick v. City of Ft. Wayne, 2009 WL 735025, *10 (N.D. Ind. March 19, 2009) ("Here, it is inappropriate to grant summary judgment on the claim of punitive damages. As discussed

24

previously, there is a question of fact whether Officer Lemon arrested D.F. despite knowledge of exculpatory evidence and without probable cause.").

XI.   CONCLUSION

For all of the reasons stated above, Defendants motion for summary judgment should be denied.

RESPECTFULLY SUBMITTED,

/s/ Jon Loevy
Attorneys for Plaintiff

Arthur Loevy
Jon Loevy
Gayle Horn
LOEVY & LOEVY
312 North May Street
Suite 100
Chicago, IL 60607
(312) 243-5900

W. William Hodes
The William Hodes P.C.
8125 Raven Rock Drive
Indianapolis, IN 46256
(317) 578-0258

## CERTIFICATE OF SERVICE

I, Jon Loevy, an attorney, certify that on June 3, 2009, I served the above Notices of Deposition by electronic filing to counsel of record.

S/Jon Loevy